**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

**TRACEY CROOM,**

        **Plaintiff,**        CIVIL ACTION NO. 13-cv-12355

   vs.

                                 DISTRICT JUDGE STEPHEN J. MURPHY

**COMMISSIONER OF**        MAGISTRATE JUDGE MONA K. MAJZOUB
**SOCIAL SECURITY,**

        **Defendant.**
_____/

## REPORT AND RECOMMENDATION

Plaintiff Tracey Croom seeks judicial review of Defendant the Commissioner of Society Security's determination that she is not entitled to Social Security benefits for her physical impairments under 42 U.S.C. § 405(g). (Docket no. 1.) Before the Court are Plaintiff's Motion for Summary Judgment (docket no. 11) and Defendant's Motion for Summary Judgment (docket no. 14). Plaintiff filed a Response to Defendant's Motion. (Docket no. 15.) The motions have been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Docket nos. 3 and 17.) The Court has reviewed the pleadings, dispenses with a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), and issues this Report and Recommendation.

**I.**        **RECOMMENDATION:**

The undersigned recommends that Plaintiff's Motion for Summary Judgment (docket no. 11) be GRANTED IN PART AND DENIED IN PART and that Defendant's Motion for Summary Judgment (docket no. 14) be DENIED. This matter should be remanded pursuant to 42 U.S.C. § 405(g) for further consideration as discussed herein.

## II. PROCEDURAL HISTORY:

Plaintiff filed an application for Supplemental Security Income Benefits and an application for Disability Insurance Benefits with protective filing dates of September 21, 2010, alleging that she had been disabled since March 13, 2006, due to back pain and knee pain. (*See* TR 14, 16.) The Social Security Administration denied benefits. (*See* TR 14.) Plaintiff requested a de novo hearing, which was held on November 30, 2011, before Administrative Law Judge (ALJ) Jerome Blum, who subsequently found that Plaintiff was not entitled to benefits because she was capable of performing a significant number of jobs in the national economy. (TR 14-21.) The Appeals Council declined to review the ALJ's decision, and Plaintiff then filed her Complaint in the instant matter. (Docket no. 1.) The parties then filed their Motions for Summary Judgment.

## III. PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE, AND VOCATIONAL EXPERT TESTIMONY

### A. Plaintiff's Testimony

Plaintiff was 39 years old at the time of the administrative hearing and 33 years old at the time of her alleged onset. (*See* TR 27.) She testified that she had graduated from high school and that the last time she had worked was in March of 2006. (TR 28.) Plaintiff indicated that she had worked as a manufacturing tech on the assembly line at Ford Motor Company from 1996 through 2006, but she stopped working because of "extreme pain in [her] knee and lower back." (TR 28, 38, 39.) Plaintiff testified that she lived alone with her six-month-old daughter, but her daughter's father came to her apartment often to help out with their child and general household chores. (TR 34-35.)

Plaintiff told the ALJ that she had two operations on her left knee, one in February of 2008 and one in March of 2009, and that she was scheduled for a third operation in June of 2012. (TR 28-29.) She stated that the first operation replaced her knee with the exception of the knee cap; the

second operation replaced her knee cap and "tightened everything up;" and the third operation was scheduled as a total knee replacement on the same knee. (TR 29.) She testified that she had a "swollen feeling [with] sharp pain" that is "pretty much constant" in her left knee. (TR 30.) She added that she also had pain down the front of her leg that "comes and goes" along with recurring sharp pains and a constant "dull nudge" in her lower back, which her doctors believe are caused by her knee problems. (TR 31-32.) She also testified that her knee would sometimes give out on her because it "won't bend on its own." (TR 31.) Plaintiff indicated that she could stand for about 5 minutes and sit for 15 to 20 minutes before she would have to change positions; that she could walk about a half a block; and that she had difficulty lifting over 10 pounds. (TR 30, 33.) She added that she had difficulty sleeping at night because of the pain and that this resulted in her taking two or three one-and-a-half to two-hour naps each day. (TR 32.) Plaintiff testified that she had "good and bad days" and that on bad days, she "barely get[s] up" and is "pretty much stationary" on the couch. (TR 32-33.) She stated that she had three or four bad days each week. (TR 33.) She told the ALJ that her pain level was an average of seven on a ten-point scale. (TR 40-41.)

  Plaintiff testified that she had been using a cane since 2006 or 2007, before she had her first surgery. (TR 30-31.) She further testified that she had been going to physical therapy and that she took two to four 750mg Vicodin each day, which made her drowsy. (TR 32.) She told the ALJ that elevating her leg did not help the pain. (TR 40.)

  With regard to daily activities, Plaintiff testified that she would drive when necessary, but she tried to avoid doing so because of her medication. (TR 33.) She told the ALJ that she could not cook because she could not stand long enough; instead, her family prepared her meals, and she reheated them in the microwave. (TR 33-43.) Plaintiff stated that she tried to do dishes when she used them so that she would not have to stand for long periods of time, and she only did laundry

3

when she was able to do so. (TR 34.) She testified that she took out the garbage, but she used small bags, and she noted that while she went grocery shopping, she took an electric cart when one was available. (TR 34-36.)

### B. Medical Record

Plaintiff and Defendant set forth substantially similar summaries of Plaintiff's medical record. (*Compare* docket no. 11 at 5-10, *with* docket no. 14 at 7-12.) Having reviewed Plaintiff's medical record independently, the undersigned hereby adopts Plaintiff's summary of her medical record, with some noted modifications and additions, as follows:

> Plaintiff visited with Dr. Jai Duck Liem on September 26, 2006 for a follow-up of back pain and left knee/leg pain. (R. 178-179). At this time, it was indicated that "[b]ecause of the significance of sciatic nerve irritation on the left leg and also a significant problem with the left knee, she has been off job." (R. 178). Dr. Liem observed limited motion, sciatic nerve irritation, and left knee severe genu valgus deformity. *Id.* Diagnoses included: protruding disc at L4-5 and L5-S1 and S1 radiculopathy; severe degenerative arthritis with genu valgus deformity of the left knee; and morbid extreme obesity. *Id.* Furthermore, Dr. Liem specifically indicated that Plaintiff displayed "awkward ambulation" and that "her extreme obesity is interfering with recovering of her back problems and also continuing of the problem with the left knee." *Id.* Dr. Liem indicated that Plaintiff was to "continue to be off the job and hopefully she will reduce her weight followed by surgical correction of the left." *Id.* Vicoden ES was prescribed. (R. 179). Plaintiff revisited Dr. Liem on December 19, 2006. (R. 176-177). At this time, it was indicated that Plaintiff tried working with two nutritionalists to lose weight, but failed to lose any weight. (R. 176). Instead, Plaintiff related that she had actually gained weight. *Id.* Dr. Liem noted that the severe genu valgus deformity seems to be worse and the lower back range of motion was reduced with her obesity. *Id.* Plaintiff was awaiting approval from her insurance provider for bariatric surgery for her obesity – Dr. Liem felt that this procedure and weight loss would "help her back pain further." *Id.* Furthermore, Dr. Liem indicated that: "I do not believe she is able to go back to any gainful employment yet." *Id.*

> March 17, 2007 treatment notes from Dr. Liem reflect that Plaintiff returned to work for one day, but was unable to tolerate it. (R. 175). Dr. Liem specifically noted that: "she was seen by the company doctor, who agreed with me and gave a lot of restriction. Obviously the company doesn't have that kind of job, therefore she has been off the job again." *Id.* Plaintiff was still waiting for her insurance to approve bariatric surgery. *Id.* Diagnoses were documented as: severe degenerative arthritis

with genu valgus deformity of the left knee; history of protruding disc at the L4-5 and L5-S1 with L5 and S1 radiculopathy; and extreme morbid obesity. *Id.* These same diagnoses were noted on May 6, 2007. (R. 173). It was observed that Plaintiff's left leg was getting weaker due to knee pain. *Id.* Significantly, Dr. Liem indicated that "if there is a restriction job available at her work, she may be able to return to basically a sitting job, but even that I do not recommend more than four hours a day along with sit and stand option." *Id.* A visit on September 7, 2007 reflects that Plaintiff had undergone bariatric surgery and had lost 40 pounds. (R. 172). However, it was noted that she is still "extremely obese." *Id.* Dr. Liem documented that Plaintiff was using a cane for ambulation and limping, and indicated "the left knee has noticeable arthritic condition with significant genu valgus deformity." *Id.* Plaintiff was continued off of work. *Id.* January 7, 2008 follow-up notes reflect that Plaintiff's weight loss was now up 102 pounds. (R. 171). At this time Plaintiff was scheduled for a left total knee arthroplasty on January 31, 2008 and Dr. Liem specifically indicated that he "recommended the same restriction job as before…which includes not more than 4 hours per day of work." *Id.*

Plaintiff underwent total left knee arthroplasty on February 14, 2008, performed by Dr. Pflaum. (R. 169). On March 4, 2008, Plaintiff was directed to perform an increased amount of outpatient exercises to improve range of motion, reduce pain, be able to ambulate better, and increase muscle strength. *Id.* Plaintiff required a cane for ambulation. *Id.* April 2, 2008 follow-up treatment notes document slight weakness to the left leg, reduced flexion, and slight swelling. (R. 167). [Dr. Liem also noted that Plaintiff "does not use a cane anymore. *Id.*] Dr. Liem recommended Plaintiff continue with rehabilitation exercises. *Id.* Plaintiff returned to Dr. Liem on April 14, 2008 and it was indicated that "she still has residuals and she still has difficulty with long distance ambulation and still complains of pain with limited motion and also the feeling of weakness to the left leg." (R. 165). Furthermore, Dr. Liem continued her rehabilitation regimen and noted that she "has the potential to improve in range of motion, less pain and improve in muscle strength and further gait training." *Id.* On May 7, 2008, Plaintiff returned to Dr. Liem after two additional weeks of extensive rehabilitation program, emphasizing with range of motion and strengthening exercise and followed by modalities, especially gait training. (R. 164, 206-207, 215-216). Swelling, tenderness, and weakness were noted in the left leg. *Id.* A diagnosis of morbid obesity was noted, however, Plaintiff had lost 150 pounds at this point since her bariatric surgery. *Id.* Plaintiff's rehabilitation program was continued. *Id.*

Plaintiff returned to Dr. Liem in April 2009, indicating that she had a left knee arthroplasty revision–this procedure was performed by Dr. Pflaum on March 12, 2009 at Oakwood Hospital. (R. 163). Dr. Liem observed that Plaintiff demonstrated genu valgus deformity of the left knee, limited range of motion with flexion and extension, and weakness in the left leg. *Id.* At this time, Dr. Liem recommended extensive rehabilitation. *Id.* A June 2, 2009 follow-up visit indicates that the left knee was still demonstrating genu valgus deformity, as well as the right

knee. (R. 161). Plaintiff also related complaints of lower back pain–MRI evidence showed protruding disc at the L4-5 level and L5-S1, along with EMG findings of L5-S1 radiculopathy. *Id.* Plaintiff was continued in the rehabilitation program for her left knee, and Dr. Liem recommended rehabilitation treatment for her lower back. (R. 161-162). June 18, 2009 treatment records reflect that Plaintiff was to have a follow-up surgery to her bariatric procedure, to remove excess skin folds and fat from her abdominal area. (R. 159). Again, Dr. Liem recommended continued therapy. *Id.*

October 7, 2009 treatment notes from Dr. Pflaum indicate that Plaintiff related complaints of burning left thigh pain. (R. 191). At this time, X-ray testing revealed satisfactory alignment of the components. *Id.* Dr. Pflaum noted an impression of: status post knee arthroplasty with continued symptoms; and neuritis neuropathy of the lateral femoral cutaneous nerve left thigh. Id. In January 2010 Plaintiff returned to Dr. Pflaum for a follow-up visit with continued complaints of knee pain. (R. 189). At this time, Dr. Pflaum specifically indicated that Plaintiff had a "loose total knee arthroplasty." *Id.*

Plaintiff visited with Dr. Joseph C. Finch on January 26, 2010–it was indicated that Plaintiff underwent the revision procedure due to loosening of the tibia and patella. (R. 223). At this time, Plaintiff related pain with walking, along with stiffness. *Id.* X-ray imaging revealed lucency of the entire tibial component and Dr. Finch opined that she would "need a tibial revision" and discussed this with her. (R. 224). [At this time, Plaintiff weighed 180 pounds. (TR 187.)]

A February 17, 2010 report from Dr. Pflaum documents a "loose total knee arthroplasty tibial component" and specifically notes that another revision arthroplasty was recommended. (R. 186). Subsequently, on April 5, 2010, Plaintiff related complaints of continued left knee pain, increased with use. (R. 185). X-ray imaging noted left lucencies of the tibial component and the stem/cement mantle. *Id.* Dr. Pflaum noted that revision arthroplasty was recommended and Plaintiff was to be "off work 6 months." *Id.*

Plaintiff visited with Dr. Pflaum again on November 8, 2010 with complaints of left knee pain "increased with standing" and "not necessarily relieved by sitting." (R. 272). At this time, Dr. Finch indicated that Plaintiff was to be "off work a minimum of 6 months." *Id.* Plaintiff was to see Dr. Finch regarding another revision surgery. *Id.*

Plaintiff was seen by Dr. Finch on November 30, 2010. (R. 271). Dr. Finch observed swelling in Plaintiff's knee, along with a loose patellar component. *Id.* Dr. Finch indicated that "she will need a revision, but she is pregnant…so we cannot proceed." *Id.* In May 2011, Plaintiff was on bed rest with her pregnancy and Dr. Pflaum indicated that Plaintiff was to return for X-ray testing after her due date. (R. 270). Dr. Pflaum completed a June 30, 2011 disability form indicating the Plaintiff

"has a loosened total knee component causing pain and instability." (R. 266). It was indicated that Plaintiff was only "partial weightbearing" and was indicated to be "totally disabled" from at least November 8, 2010 – July 31, 2011. (R. 267). It was estimated that Plaintiff could return to work on August 1, 2011. (R. 268). Subsequently, it was noted on July 18, 2011 that Plaintiff was "medically unable to work" and on July 21, 2011, Dr. Pflaum indicated that Plaintiff was unable to work from November 8, 2010 – October 31, 2011, further extending her disability from any employment. (R. 261-261).

September 8, 2011 treatment notes reflect that Plaintiff was having an increased amount of left knee pain, with loosening of her tibial component. (R. 258). It was indicated that she would be having a revision arthroplasty by Dr. Finch and was continued on Vicodin ES. *Id.*

Plaintiff attended a consultative examination with State agency medical consultant, Dr. Yung K. Seo, on December 20, 2010. (R. 226-230). Plaintiff indicated that her surgery was postponed due to her being pregnant. (R. 226). Furthermore, she related complaints of left knee pain with difficulty walking for prolonged periods. *Id.* [Dr. Seo noted that Plaintiff "ambulates without any assistive device," but Plaintiff told her that she] . . . "only walks short distances without using any cane or assistive device." [(TR 226-27.)] Plaintiff related that she could only stand about 15 minutes, and has difficulty sitting due to discomfort. *Id.* Dr. Seo observed a limited flexion of the left knee with pain, and a "clicking" sound was noted. (R. 227). Furthermore, her gait was noted as "antalgic." *Id.* Dr. Seo indicated that Plaintiff was expected to make significant medical improvement, but not until her second surgery of her total knee replacement. *Id.*

Plaintiff attended a December 17, 2011 consultative examination with State agency medical consultant, Dr. Katherine H. Karo. (R. 276-283). Plaintiff related symptoms of left knee pain and low back pain. (R. 276). Plaintiff ambulated with a cane in her right hand and indicated that she could stand for 5 minutes at one time, sit for 5 minutes at one time, and walk for 5 minutes. *Id.* Plaintiff demonstrated decreased and painful range of lumbar spine motion, painful straight-leg raises, and limited left knee flexion. (R. 278). Dr. Karo observed that Plaintiff ambulated with an antalgic/ataxic gait and a left-sided limp. (R. 278, 283). Furthermore, Dr. Karo specifically indicated that Plaintiff's need for a cane was supported by the clinical evidence. (R. 283). It was also indicated that Plaintiff was in need of a second total knee arthroplasty. (R. 278). An X-ray of the claimant's left knee indicates degenerative osteoarthritis changes of the bony structures, and soft tissue swelling. (R. 279). Furthermore, an X-ray of the lumbar spine is significant for findings of: degenerative osteoarthritis changes, with moderate narrowing and sclerotic changes of the intervertebral disc space at L4-5 and L5-S1 levels. *Id.*

(Docket no. 11 at 5-10.)

### C. The Vocational Expert

After confirming that Plaintiff had no skills that would transfer to sedentary work, the ALJ asked the VE, ". . . [A]re there any bench assembly jobs in Detroit and the state with a sit/stand option?" (TR 41.) The VE responded that there are 4,000 jobs as an assembler, inspector, or sorter in Southeast Michigan and "[d]ouble that figure" in the state. (TR 41.) The VE acknowledged that these jobs were "[f]ound in the DOT." (TR 41.) The ALJ then asked, "So this would allow you, even though the DOT is silent on this, to have a sit/stand option while doing the jobs?" (TR 42.) The VE responded, "Yes." (TR 42.) The ALJ asked the VE if "the legal definition is up to ten pounds," to which the VE responded, "That's Correct." (TR 42.) The VE then testified that the average weight lifted when performing one of these jobs is two-to-five pounds. (TR 42.)

The ALJ then asked the VE, "[I]f we factor in her complaints, the degree of pain, seven out of ten; necessity to lay down and sleep due to the effects of medication; limitations on walking standing, sitting would she be able to do these jobs?" (TR 42-43.) The VE testified that Plaintiff would not be able to perform these jobs. (TR 43.)

### IV. ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that Plaintiff met the insured status requirements of the Act through September 30, 2012; that she had not engaged in substantial gainful activity since March 13, 2006, Plaintiff's alleged onset date; and that she suffered from severe left knee and leg problems post-status total knee replacement. (TR 16.) The ALJ further found that Plaintiff's impairments did not meet or equal those listed in the Listing of Impairments. (TR 16.) The ALJ then found that Plaintiff had the residual functional capacity to perform "unskilled sedentary work . . . except [that she] is limited to lifting two to five pounds and requires a sit-stand option." (TR 16-20.) The ALJ then determined, in reliance on the VE's testimony, that Plaintiff was capable of performing a significant

8

number of jobs in the national economy. (TR 20-21.) The ALJ found that Plaintiff was not disabled under the Social Security Act at any time from March 13, 2006, through the date of the ALJ's decision. (TR 21.)

## V.     LAW AND ANALYSIS

### A.     Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can

go either way, without interference by the courts").

### B. Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five-step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1) Plaintiff was not presently engaged in substantial gainful employment; and

(2) Plaintiff suffered from a severe impairment; and

(3) the impairment met or was medically equal to a "listed impairment;" or

(4) Plaintiff did not have the residual functional capacity (RFC) to perform relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented Plaintiff from doing past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work experience to determine if Plaintiff could perform other work. If not, Plaintiff would be deemed disabled. *See id.* at § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

### C. Analysis

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a

sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)). Under a sentence-four remand, the Court has the authority to "enter upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing. 42 U.S.C. § 405(g). Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration." *Morgan v. Astrue*, 10-207, 2011 WL 2292305, at *8 (E.D.Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174). Plaintiff argues that this matter should be reversed or remanded under sentence four for the following reasons: (1) the ALJ failed to consider the effects of Plaintiff's obesity at any step of the analysis; (2) the ALJ's Step-3 analysis is flawed because he failed to consider Plaintiff's non-severe impairments and he failed to explain why Plaintiff's impairments did not meet or medically equal one of the listed impairments; (3) the ALJ failed to properly consider Plaintiff's credibility; (4) the ALJ's RFC assessment and his corresponding questions to the VE are not supported by substantial evidence because the ALJ neglected to account for Plaintiff's use of a cane. (*See* docket no. 11.)

### 1. The ALJ's Failure to Consider Plaintiff's Obesity

Plaintiff asserts that the ALJ did not properly discuss or even consider the impact of Plaintiff's obesity in determining her RFC. (*Id.* at 14-15.) In support of this contention, Plaintiff relies on SSR 02-1p, which discusses obesity as a risk factor for work-based limitations. (*Id.* at 20-22.) As Plaintiff notes, SSR 02-1p classifies individuals with regard to obesity by considering Body Mass Index (BMI). Individuals with a BMI greater to or equal to 30 are considered "obese" with those above a BMI of 40 as having the most "extreme" type of obesity with the greatest risk

11

for developing obesity-related impairments. SSR 02-1p. In evaluating the effects of obesity, SSR 02-1p "does not mandate a particular mode of analysis," but it does "direct[] an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." *Nejat v. Comm'r*, 359 Fed. Appx. 574, 577 (6th Cir. 2009) (citation and internal quotation marks omitted).

Even after losing significant weight through bariatric surgery, on December 17, 2011, (17 days after Plaintiff's administrative hearing), Plaintiff weighed 218 pounds, resulting in a BMI of 34.1. (*See* TR 278.) At what appears to have been her lowest weight throughout her alleged disability period, Plaintiff weighed 180 pounds on January 26, 2010, resulting in a BMI of 28.2, which is considered "overweight." (*See* TR 187.) The ALJ did not discuss or even mention Plaintiff's weight at any step of his analysis or during Plaintiff's administrative hearing. Defendant acknowledges this deficiency but argues as follows: Plaintiff's weight on December 12, 2011, was determined by Dr. Karo, and the ALJ substantially relied on Dr. Karo's report in determining Plaintiff's RFC; therefore, "[b]ecause the ALJ relied substantially on the very report that [Plaintiff] cites to demonstrate her obesity as the major basis for the ALJ's RFC finding, the ALJ certainly considered [Plaintiff's] obesity when he made his [RFC] finding." (Docket no. 14 at 13-14.)

Defendant's argument, however, is pure speculation. It is not enough for Defendant to suggest that the ALJ might have considered Plaintiff's obesity–he was required to actually do so. Plaintiff notes that she had been diagnosed as "obese" since as early as 2006 and through 2011, even after having bariatric surgery. (*See* TR 178, 278.) And while Plaintiff fell below the "obese" BMI index of 30 for a period of time on or around January of 2010, the ALJ's failure to discuss Plaintiff's weight and explain why he did not consider any additional functional limitations as a result of her obesity warrants remand. Without such an explanation, the Court cannot conduct a meaningful

12

review of the ALJ's decision.

### 2. The ALJ's Step-3 Analysis

Plaintiff argues that the ALJ erred in his Step-3 analysis by concluding that Plaintiff did not have an impairment or combination of impairments that meets or equals a listed impairment. (Docket no. 11 at 17-21.) Plaintiff contends that the ALJ erred because he reached this conclusion without evaluating or even addressing which listings he considered and why Plaintiff did not meet them. In particular, Plaintiff argues that the ALJ failed to address or discuss evidence of her protruding disks or her obesity as it compared to Listing 1.04(A) and failed to "even indicate that Listing 1.02(A) ha[d] been considered or identif[ied] as a relevant Listing in this case." (*Id.*) Plaintiff focuses primarily on Listing 1.02(A) and asserts that the ALJ should have found that she equaled the criteria of this Listing because of her knee problems. (*See id.* at 19-20 (citing to supporting evidence in the medical record).)

Listing 1.02, Category of Impairments, Musculoskeletal reads as follows:

1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

A claimant who meets all the criteria of a listing will be deemed conclusively disabled and entitled to benefits. *Reynolds v. Comm'r*, 424 Fed. Appx. 411, 414 (6th Cir. 2011).

In *Reynolds* the Sixth Circuit held that as part of a Step-3 analysis, "an ALJ must analyze the claimant's impairments and provide an analysis to explain his conclusion that the claimant did not meet or medically equal the listing. *Id.* at 415. The *Reynolds* court found that the ALJ, in failing

to provide any assessment of the evidence pertaining to listing 1.04, essentially skipped an entire step of the sequential analysis. *Id.* at 416. Further, the court found that the error was not harmless because a finding that a person meets a listed impairment immediately qualifies her as a disabled individual and entitles her to benefits. *Id.* The court concluded that "the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review[; w]ithout it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Id.* Since *Reynolds* was decided, courts in this district have regularly remanded a case for further proceedings when the Step Three analysis was found lacking. *See Christephore v. Comm'r*, No. 11-13547, 2012 WL 2274328, at *5-10 (E.D. Mich. June 18, 2012), *Bolla v. Comm'r*, No. 11-11008, 2012 WL 884820, at *6-8 (E.D. Mich. Feb. 3, 2012); *Mitchell v. Comm'r*, No. 11-11438, 2012 WL 2711398, at *5-8 (E.D. Mich. May 29, 2012); *M.G. v. Comm'r*, No. 10-12957, 2012 WL 954638 (E.D. Mich. March 21, 2012).

Here, the ALJ made a Step Two finding that Plaintiff has the severe impairments of "left knee and leg problems post-status total knee replacement." (TR 16.) He then went on to Step Three where he concluded without explanation that the "claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." (TR 14). The ALJ continued to Step 4 without providing any analysis to justify his Step Three conclusion.

Defendant points to medical evidence in the record regarding Plaintiff's ability to work and asserts that this evidence "is a strong indication that she did not have an impairment of listing level severity at that time." (Docket no. 14 at 14-15.) Defendant then contends that Plaintiff's "comments to her physicians also show that she did not have a left knee impairment of listing level severity." (*Id.* at 15.) Notably, however, Defendant does not address the ALJ's determination at Step 3. At

14

most, Defendant's argument is a post-hoc rationalization of the ALJ's decision, which is insufficient to support Defendant's position. *See* Christephore v. Commissioner of Social Sec., No. 11-13547, 2012 WL 2274328, *6 (E.D. Mich. June 18, 2012) (Roberts, J.) ("[I]t is not the Court's job to conduct a *de novo* review of the evidence or to rubber stamp the ALJ's decision. The Court must ensure both that the ALJ applied the correct legal standard and that his decision is supported by substantial evidence. Moreover, it is the ALJ's rationale that is under review, not defense counsel's.").

Although the ALJ considered Plaintiff's knee problems at a later step, the ALJ neither demonstrated that he considered the record evidence at Step Three nor did he show that he compared Plaintiff's impairments to listing 1.02 or to any other relevant listing. The record contains evidence to suggest that Plaintiff has major dysfunction of a weight-bearing joint resulting in the inability to ambulate effectively. While Defendant may be able to point to some evidence to suggest otherwise, the ALJ's failure to review and discuss this evidence at Step Three of the sequential analysis and provide an explanation as to how it compares to a listed impairment warrants remand. As with the ALJ's discussion of Plaintiff's obesity, such an analysis is necessary so that the ALJ can make a proper determination and so that the Court can undertake a meaningful review.

### 3. Plaintiff's Credibility

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner*, 127 F.3d 525, 531 (6th Cir. 1997). But Credibility assessments are not insulated from judicial review. Despite the deference that is due, such a determination must nevertheless be supported by substantial evidence. *Id.* An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and

must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p. "It is not enough to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" *Id.* "The adjudicator may find all, only some, or none of an individual's allegations to be credible" and may also find the statements credible to a certain degree. *See id.*

Plaintiff, in part, asserts that the ALJ applied the wrong legal standard because used "'opaque boilerplate' language" when he found that Plaintiff's statements were not credible "to the extent they [were] inconsistent with the [ALJ's RFC determination]." (Docket no. 11 at 21-22.) In support of this contention, Plaintiff cites to *Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012), in which the court found this standard "template" unintelligible. While the undersigned agrees with Plaintiff that such a finding would be erroneous, and also agrees with the Seventh Circuit that the template language should be clarified, the ALJ did not make such a finding. The ALJ's comment refers to the RFC located in the section heading of his decision, which is analyzed therein. Thus, when the ALJ stated that Plaintiff's limitations were not credible "to the extent they are inconsistent with [the RFC]," the ALJ was merely stating that he developed the RFC based on the limitations that he did find credible. Therefore, the Court finds that the ALJ's use of this language was not contrary to law.

Plaintiff also asserts, however, that the ALJ erred when his only analysis for discrediting Plaintiff's credibility was that her "exaggerations [of heightened pain levels] have no support in the medical record." (Docket no. 11 at 21 (citing TR 17).) The undersigned agrees. Defendant points to evidence in the medical record to support the ALJ's determination, but reliance on the medical record is insufficient to support a credibility determination. That is, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the

16

Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 416.929(c)(2). The ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain. *See* 20 C.F.R. § 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994) (applying these factors). Here, with regard to his credibility analysis, the ALJ did not discuss Plaintiff's daily activities; any precipitating or aggravating factors; the type, dosage, effectiveness, or side effects of any medications; the effectiveness of Plaintiff's treatment measures; or any other measures used to relieve pain. To the contrary, the ALJ specifically stated that his determination was based on his review of the medical record. Therefore, this matter should be remanded for a proper discussion of Plaintiff's credibility.

### 4. Plaintiff's Need for a Cane and the ALJ's RFC

Plaintiff asserts that the ALJ erred when he failed to consider Plaintiff's need for use of a cane when determining Plaintiff's RFC and when questioning the VE. (Docket no. 11 at 23-24.) Plaintiff relies on SSR 96-9p, which states, in relevant part, that the need to use a cane or other "hand-held assistive device" may erode the sedentary work base in certain circumstances. (*See* SSR 96-9p. Moreover, Plaintiff notes, SSR 96-9p suggest that in circumstances where such a device is used for balance, "it may be especially useful to consult a vocational resource in order to make a judgment regarding the individual's ability to make an adjustment to other work." SSR 96-9p.

17

Defendant asserts that "the ALJ made sure that [Plaintiff's] other hand could be free . . . as the ALJ limited lifting to two-to-five pounds." (Docket no. 14 at 20.)

The parties' arguments, however, are inapposite because Plaintiff's contention rests on the assumption that the ALJ erred when he failed to include the use of a cane in his RFC determination. That is, if the ALJ had determined that Plaintiff needed to use a cane for any purpose, it may have been error to ignore the limiting effects when determining Plaintiff's work base. Here, however, even though Plaintiff correctly notes that "Defendant does agree that Plaintiff has a 'need to use a cane'" (docket no. 15 at 5 (quoting docket no. 14 at 20)), the ALJ made no such finding. When discussing Plaintiff's medical record, the ALJ noted that while Plaintiff presented to Dr. Karo in December 2011 with a cane and that Dr. Karo "noted that the claimant requires a walking aid to reduce pain," Plaintiff "was able to sit and stand without assistance." (TR 19.) He also noted that in January 2010, Plaintiff presented to Dr. Finch, who indicated that Plaintiff "ambulated without an assistive device and only exhibited a mild antalgic gain." (TR 18.) Thus, while the medical record supports Plaintiff's contention that her need to a cane is "well-established," substantial evidence also supports the ALJ's decision to exclude the use of a cane in Plaintiff's RFC. Therefore, because this determination falls within the ALJ's "zone of choice," the Court should deny Plaintiff's motion in this regard.

## VI.    CONCLUSION

For the reasons stated herein, the undersigned recommends that Plaintiff's Motion for Summary Judgment (docket no. 11) be GRANTED IN PART AND DENIED IN PART and that Defendant's Motion for Summary Judgment (docket no. 14) be DENIED. This matter should be remanded pursuant to 42 U.S.C. § 405(g) for further consideration.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: June 24, 2014         s/ Mona K. Majzoub
                             MONA K. MAJZOUB
                             UNITED STATES MAGISTRATE JUDGE


**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: June 24, 2014                  s/ Lisa C. Bartlett
                                             Case Manager